# EXHIBIT A

Case 4:09-cv-03305   Document 1-2   Filed in TXSD on 10/13/2009   Page 2 of 24

---

The Library of Congress > THOMAS Home > Bills, Resolutions > Search Results

---

| THIS SEARCH | THIS DOCUMENT | GO TO |
| --- | --- | --- |
| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

---

| GPO's PDF Display | Congressional Record References | Bill Summary & Status | Printer Friendly Display - 8,521 bytes. [Help] | XML Display [Help] |
| --- | --- | --- | --- | --- |

---

**Airline Passenger Bill of Rights Act of 2009 (Introduced in House)**

HR 624 IH

111th CONGRESS

1st Session

**H. R. 624**

To amend title 49, United States Code, to ensure air passengers have access to necessary services while on a grounded air carrier, and for other purposes.

**IN THE HOUSE OF REPRESENTATIVES**

**January 21, 2009**

Mr. THOMPSON of California introduced the following bill; which was referred to the Committee on Transportation and Infrastructure

---

**A BILL**

To amend title 49, United States Code, to ensure air passengers have access to necessary services while on a grounded air carrier, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the `Airline Passenger Bill of Rights Act of 2009'.

## SEC. 2. AIRLINE CUSTOMER SERVICE COMMITMENT.

(a) In General- Chapter 417 of title 49, United States Code, is amended by adding at the end the following:

`SUBCHAPTER IV--AIRLINE CUSTOMER SERVICE

`Sec. 41781. Air carrier and airport contingency plans for long on-board tarmac delays

`(a) Definition of Tarmac Delay- The term `tarmac delay' means the holding of an aircraft on the ground before taking off or after landing with no opportunity for its passengers to deplane.

`(b) Submission of Air Carrier and Airport Plans- Not later than 60 days after the date of the enactment of the Airline Passenger Bill of Rights Act of 2009, each air carrier and airport operator shall submit, in accordance with the requirements under this section, a proposed contingency plan to the Secretary of Transportation for review and approval.

`(c) Minimum Standards- The Secretary of Transportation shall establish minimum standards for elements in contingency plans required to be submitted under this section to ensure that such plans effectively address long on-board tarmac delays and provide for the health and safety of passengers and crew.

`(d) Air Carrier Plans- The plan shall require each air carrier to implement at a minimum the following:

`(1) PROVISION OF ESSENTIAL SERVICES- Each air carrier shall provide for the essential needs of passengers on board an aircraft at an airport in any case in which the departure of a flight is delayed or disembarkation of passengers on an arriving flight that has landed is substantially delayed, including--

PLAINTIFF'S EXHIBIT A

`(A) adequate food and potable water;

`(B) adequate restroom facilities;

`(C) cabin ventilation and comfortable cabin temperatures; and

`(D) access to necessary medical treatment.

`(2) RIGHT TO DEPLANE-

`(A) IN GENERAL- Each air carrier shall submit a proposed contingency plan to the Secretary of Transportation that identifies a clear time frame under which passengers would be permitted to deplane a delayed aircraft. After the Secretary has reviewed and approved the proposed plan, the air carrier shall make the plan available to the public.

`(B) DELAYS-

`(i) IN GENERAL- As part of the plan, except as provided under clause (iii), an air carrier shall provide passengers with the option of deplaning and returning to the terminal at which such deplaning could be safely completed, or deplaning at the terminal if--

`(I) 3 hours have elapsed after passengers have boarded the aircraft, the aircraft doors are closed, and the aircraft has not departed; or

`(II) 3 hours have elapsed after the aircraft has landed and the passengers on the aircraft have been unable to deplane.

`(ii) FREQUENCY- The option described in clause (i) shall be offered to passengers at a minimum not less often than once during each successive 3-hour period that the plane remains on the ground.

`(iii) EXCEPTIONS- This subparagraph shall not apply if--

`(I) the pilot of such aircraft reasonably determines that the aircraft will depart or be unloaded at the terminal not later than 30 minutes after the 3 hour delay; or

`(II) the pilot of such aircraft reasonably determines that permitting a passenger to deplane would jeopardize passenger safety or security.

`(C) APPLICATION TO DIVERTED FLIGHTS- This section applies to aircraft without regard to whether they have been diverted to an airport other than the original destination.

`(D) REPORTS- Not later than 30 days after any flight experiences a tarmac delay lasting at least 3 hours, the air carrier responsible for such flight shall submit a written description of the incident and its resolution to the Aviation Consumer Protection Office of the Department of Transportation.

`(e) Airport Plans- Each airport operator shall submit a proposed contingency plan under subsection (b) that contains a description of--

`(1) how the airport operator will provide for the deplanement of passengers following a long tarmac delay; and

`(2) how, to the maximum extent practicable, the airport operator will provide for the sharing of facilities and make gates available at the airport for use by aircraft experiencing such delays.

`(f) Updates- The Secretary shall require periodic reviews and updates of the plans as necessary.

`(g) Approval-

`(1) IN GENERAL- Not later than 6 months after the date of the enactment of this section, the Secretary of Transportation shall--

`(A) review the initial contingency plans submitted under subsection (b); and

`(B) approve plans that closely adhere to the standards described in subsections (d) or (e), whichever is applicable.

`(2) UPDATES- Not later than 60 days after the submission of an update under subsection (f) or an initial contingency plan by a new air carrier or airport, the Secretary shall--

`(A) review the plan; and

`(B) approve the plan if it closely adheres to the standards described in subsections (d) or (e), which ever is applicable.

`(h) Civil Penalties- The Secretary may assess a civil penalty under section 46301 against any air carrier or airport operator that does not submit, obtain approval of, or adhere to a contingency plan submitted under this section.

`(i) Public Access- Each air carrier and airport operator required to submit a contingency plan under this section shall ensure public access to an approved plan under this section by--

`(1) including the plan on the Internet Web site of the carrier or airport; or

`(2) disseminating the plan by other means, as determined by the Secretary.

### `Sec. 41782. Air passenger complaints hotline and information

`(a) Air Passenger Complaints Hotline Telephone Number- The Secretary of Transportation shall establish a consumer complaints hotline telephone number for the use of air passengers.

`(b) Public Notice- The Secretary shall notify the public of the telephone number established under subsection (a).

`(c) Authorization of Appropriations- There are authorized to be appropriated such sums as may be necessary to carry out this section, which sums shall remain available until expended.'.

(b) Conforming Amendment- The chapter analysis for chapter 417 of title 49, United States Code, is amended by adding at the end the following:

### `subchapter iv--airline customer service

`41781. Air carrier and airport contingency plans for long on-board tarmac delays.

`41782. Air passenger complaints hotline and information.'.

---

| THIS SEARCH | THIS DOCUMENT | GO TO |
|---|---|---|
| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

---

# EXHIBIT B

Case 4:09-cv-03305   Document 1-2   Filed in TXSD on 10/13/2009   Page 6 of 24

The Library of Congress > THOMAS Home > Bills, Resolutions > Search Results

| THIS SEARCH | THIS DOCUMENT | GO TO |
| --- | --- | --- |
| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

| GPO's PDF Display | Congressional Record References | Bill Summary & Status | Printer Friendly Display - 8,550 bytes.[Help] | XML Display [Help] |

**Airline Passenger Bill of Rights Act of 2009 (Introduced in Senate)**

S 213 IS

### 111th CONGRESS

1st Session

### S. 213

To amend title 49, United States Code, to ensure air passengers have access to necessary services while on a grounded air carrier, and for other purposes.

### IN THE SENATE OF THE UNITED STATES

### January 12, 2009

Mrs. BOXER (for herself and Ms. SNOWE) introduced the following bill; which was read twice and referred to the Committee on Commerce, Science, and Transportation

### A BILL

To amend title 49, United States Code, to ensure air passengers have access to necessary services while on a grounded air carrier, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the `Airline Passenger Bill of Rights Act of 2009'.

## SEC. 2. AIRLINE CUSTOMER SERVICE COMMITMENT.

(a) In General- Chapter 417 of title 49, United States Code, is amended by adding at the end the following:

## `SUBCHAPTER IV--AIRLINE CUSTOMER SERVICE

## `Sec. 41781. Air carrier and airport contingency plans for long on-board tarmac delays

`(a) Definition of Tarmac Delay- The term `tarmac delay' means the holding of an aircraft on the ground before taking off or after landing with no opportunity for its passengers to deplane.

`(b) Submission of Air Carrier and Airport Plans- Not later than 60 days after the date of the enactment of the Airline Passenger Bill of Rights Act of 2009, each air carrier and airport operator shall submit, in accordance with the requirements under this section, a proposed contingency plan to the Secretary of Transportation for review and approval.

`(c) Minimum Standards- The Secretary of Transportation shall establish minimum standards for elements in contingency plans required to [+] submitted under this section to ensure that such plans effectively address long on-board tarmac delays and provide for the health and safety of passengers and crew.

`(d) Air Carrier Plans- The plan shall require each air carrier to implement at a minimum the following:

`(1) PROVISION OF ESSENTIAL SERVICES- Each air carrier shall provide for the essential needs of passengers on board an aircraft at an airport in any case in which the departure of a flight is delayed or disembarkation of passengers on an arriving flight that has landed is substantially delayed, including--

`(A) adequate food and potable water;

`(B) adequate restroom facilities;

`(C) cabin ventilation and comfortable cabin temperatures; and

`(D) access to necessary medical treatment.

`(2) RIGHT TO DEPLANE-

`(A) IN GENERAL- Each air carrier shall submit a proposed contingency plan to the Secretary of Transportation that identifies a clear time frame under which passengers would be permitted to deplane a delayed aircraft. After the Secretary has reviewed and approved the proposed plan, the air carrier shall make the plan available to the public.



PLAINTIFF'S
EXHIBIT
B

`(B) DELAYS-

`(i) IN GENERAL- As part of the plan, except as provided under clause (iii), an air carrier shall provide passengers with the option of deplaning and returning to the terminal at which such deplaning could be safely completed, or deplaning at the terminal if--

`(I) 3 hours have elapsed after passengers have boarded the aircraft, the aircraft doors are closed, and the aircraft has not departed; or

`(II) 3 hours have elapsed after the aircraft has landed and the passengers on the aircraft have been unable to deplane.

`(ii) FREQUENCY- The option described in clause (i) shall be offered to passengers at a minimum not less often than once during each successive 3-hour period that the plane remains on the ground.

`(iii) EXCEPTIONS- This subparagraph shall not apply if--

`(I) the pilot of such aircraft reasonably determines that the aircraft will depart or be unloaded at the terminal not later than 30 minutes after the 3 hour delay; or

`(II) the pilot of such aircraft reasonably determines that permitting a passenger to deplane would jeopardize passenger safety or security.

`(C) APPLICATION TO DIVERTED FLIGHTS- This section applies to aircraft without regard to whether they have been diverted to an airport other than the original destination.

`(D) REPORTS- Not later than 30 days after any flight experiences a tarmac delay lasting at least 3 hours, the air carrier responsible for such flight shall submit a written description of the incident and its resolution to the Aviation Consumer Protection Office of the Department of Transportation.

`(e) Airport Plans- Each airport operator shall submit a proposed contingency plan under subsection (b) that contains a description of--

`(1) how the airport operator will provide for the deplanement of passengers following a long tarmac delay; and

`(2) how, to the maximum extent practicable, the airport operator will provide for the sharing of facilities and make gates available at the airport for use by aircraft experiencing such delays.

`(f) Updates- The Secretary shall require periodic reviews and updates of the plans as necessary.

`(g) Approval-

`(1) IN GENERAL- Not later than 6 months after the date of the enactment of this section, the Secretary of Transportation shall--

`(A) review the initial contingency plans submitted under subsection (b); and

`(B) approve plans that closely adhere to the standards described in subsections (d) or (e), whichever is applicable.

`(2) UPDATES- Not later than 60 days after the submission of an update under subsection (f) or an initial contingency plan by a new air carrier or airport, the Secretary shall--

`(A) review the plan; and

`(B) approve the plan if it closely adheres to the standards described in subsections (d) or (e), which ever is applicable.

`(h) Civil Penalties- The Secretary may assess a civil penalty under section 46301 against any air carrier or airport operator that does not submit, obtain approval of, or adhere to a contingency plan submitted under this section.

`(i) Public Access- Each air carrier and airport operator required to submit a contingency plan under this section shall ensure public access to an approved plan under this section by--

`(1) including the plan on the Internet Web site of the carrier or airport; or

`(2) disseminating the plan by other means, as determined by the Secretary.

### `Sec. 41782. Air passenger complaints hotline and information

`(a) Air Passenger Complaints Hotline Telephone Number- The Secretary of Transportation shall establish a consumer complaints hotline telephone number for the use of air passengers.

`(b) Public Notice- The Secretary shall notify the public of the telephone number established under subsection (a).

`(c) Authorization of Appropriations- There are authorized to be appropriated such sums as may be necessary to carry out this section, which sums shall remain available until expended.'.

(b) Conforming Amendment- The chapter analysis for chapter 417 of title 49, United States Code, is amended by adding at the end the following:

### `subchapter iv--airline customer service

`41781. Air carrier and airport contingency plans for long on-board tarmac delays.

`41782. Air passenger complaints hotline and information.'.

------------------------------------------------------------------------

*THIS SEARCH*      *THIS DOCUMENT*      GO TO

| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

THOMAS Home | Contact | Accessibility | Legal | USA.gov

# EXHIBIT C

# Excessive Surface Delays Final Report

## *A-CATM CED:*
## *NextGen Collaborative Air Traffic Management (CATM) Acceleration*

### Order Number: DTFAWA-08-C-00069
Task Order: 6

<u>Authors in alphabetical order:</u>
Fredrick Foreman, PhD
Dan Larsen
Taryn Lewis
Jason Pepper

FAA Task Monitor:  Midori Tanino
FAA Technical Contact: Kareena Nair
Metron Aviation Principal Investigator:  Frederick Foreman

April 20, 2009



*METRON AVIATION*

Metron Aviation, Inc.
45300 Catalina Court, Suite 101
Dulles, VA 20166



PLAINTIFF'S
EXHIBIT
C

# ACKNOWLEDGMENTS

We are grateful to our FAA Task Monitor Midori Tanino and our Technical Point of Contact Kareena Nair for their support and guidance to this research on excessive surface delays.

*Excessive Surface Delays Final Report, Task Order #: 6*



# Executive Summary

Excessive Surface Delays have been defined through groups seeking a *Passenger Bill of Rights* as any single delay of three (3) hours or more where passengers are on an aircraft that is sitting on the TARMAC and not at a gate. This report presents an analysis of the Bureau of Transportation and Statistics (BTS) data on excessive surface delays and investigates the possible causes of excessive surface delays. Although time did not permit a complete analysis of excessive surface delays, several conclusions can be drawn. It is concluded that excessive surface delays are primarily caused by:

1. Airport congestion due to gate availability issues when arrivals exceed the number of available gates and the number of pushbacks exceeding airport departure capacity,
2. Imbalances in arrival and departure rates,
3. Inefficient implementation of airport de-icing and anti-icing procedures,
4. Aircraft equipage issues restricting departure routes during inclement weather events, and
5. Airline scheduling plans that could lead to extreme congestion at major airports.

A familiar scene at airports these days is when arriving flights are forced to wait on the ramp, sometimes for a long time, before finally proceeding to their gate because the gate is occupied by another aircraft.

While excessive surface delays only represent a fraction of the total number of flights, its impact on the passengers experiencing three (3) to nine (9) hours on an aircraft with no food, water, or bathroom facilities is unimaginable. This final report addresses the magnitude of the problem, the airports that are most likely to experience excessive surface delays, the airlines experiencing excessive surface delays, the link between the airports and airlines, the origin-destination pairs involved in excessive surface delays, the critical dates where excessive surface delays occurred in 2008, when excessive surface delays occur most frequently, case studies of known excessive surface delays events, modeling aspects of excessive surface delays, and future work for actually mitigating excessive surface delays.

iii

*METRON AVIATION*

# Table of Contents

1    Introduction ...................................................................................................................... 1

    1.1    Gate Availability ........................................................................................................ 1

    1.2    Air Carriers Experiencing Frequent Excessive Surface Delays .............................. 3

    1.3    Airports where Excessive Surface Delays Occur Most Frequently .......................... 6

    1.4    Taxi-Out Times Relating Airports to Air Carriers ................................................... 7

    1.5    Critical Dates When Taxi-Out Times ≥ 3 Hours Occurred .................................... 10

    1.6    Origin to Destination Analysis of Excessive Surface Delays ................................ 13

2    Excessive Surface Delay Modeling ................................................................................ 14

3    Case Studies .................................................................................................................... 17

    3.1    Case Study at IAH on December 10, 2008 ........................................................... 17

    3.2    Case Study at ATL .................................................................................................. 21

4    Conclusions .................................................................................................................... 22

5    Recommendations .......................................................................................................... 22

## List of Figures

Figure 1: Number of Flights with Taxi-Out Times > 120 Minutes (January – December 2008) ................................. 3

Figure 2: % Distribution of XSDs at JFK, LGA, ATL, and PHL by Airline .......................................... 9

Figure 3: % Distribution of XSDs at LGA, IAH, DFW, and ORD by Airline ..................................... 10

Figure 4: Excessive Surface Delays ≥ 3 Hours (January – December 2008) ...................................... 12

Figure 5: Number of Flight Operations from January to December 2008 ........................................... 13

Figure 6: Origin-Destination Pairs where Excessive Surface Delays Occurred ................................. 14

Figure 7: Airport Capacity Model to Model Gate Attributes as a Contributing Factor to Excessive Surface Delays . 15

Figure 8: Airport Capacity Model Showing Details of Model for One Airline ...................................... 15

Figure 9: Continental Airlines (CO) Taxi-in Times at IAH: Dec 10, 2008, 16:30 to 00:12 during Snow Event ........ 18

Figure 10: Express Jet (XE) Taxi-Out Time at IAH on Dec 10, 2008, 16:30 to 00:12 during Snow Event ............... 19

## List of Tables

Table 1: Taxi-Out Times (minutes) by Airline ............................................................................... 4

Table 2: Taxi-Out Times (minutes) by Affiliated Carriers by Time Category by % of Flight Operations ................ 5

Table 3: Taxi-Out Times (minutes) by all Carriers by Time Category by % of Flight Operations .......................... 5

Table 4: Number of Flights by Airport with Taxi-Out Times (minutes) > 3 Hours .............................. 6

Table 5: Incidence Map Relating the Number of Taxi-Out Incidences > 3 Hours by Airport and Airline ............... 7

Table 6: Critical Dates for Taxi-Out Times ≥ 3 Hours (January – December 2008) ............................ 11

Table 7: Taxi-In Details on Dec 10, 2008 at IAH during Snow Event ................................................. 17

Table 8: Ground Stops issued on Dec 10, 2008 at IAH during Snow Event ........................................ 20

*Excessive Surface Delays Final Report, Task Order #: 6*

*METRON AVIATION*

# 1   Introduction

Following several events where passengers were stranded on airport surfaces for more than six (6) hours, passengers formed a coalition to lobby Congress for a Customer Bill of Rights for airline passengers. A group of passengers on American Airline's flights 1348, 534, and 1008 traveling from San Francisco to Dallas were stranded for more than eight (8) hours in December 2006 due to heavy storms in Dallas. The passengers were trapped on the TARMACS for more than eight (8) hours without working bathroom facilities, food, and running water. From this incident, the Flyers Rights Organization was formed to lobby the US Congress to pass legislation to protect passengers from experiencing excessive surface delays (XSDs) without compensation, the option to deplane, and use of working bathroom facilities, food, and water.

Excessive departure delays greater than three (3) hours are at the heart of the problem that led to the proposed *Customer Bill of Rights* for airline passengers. The Canadian Government (House of Commons) passed a similar bill on September 11, 2008 while the US Congress is still struggling with the issue. The Canadian bill gives passengers certain amenities and rights when a flight is delayed for more than 90 minutes.

Irregular operations can lead to flights spending long periods of time (hours) between pushback and takeoff. Some of the factors that contribute to excessive surface delays include airport congestion due to gate availability issues when arrivals exceed the number of available gates and the number of pushbacks exceeding airport departure capacity, imbalances in arrival and departure rates, inefficient airport de-icing and anti-icing procedures, aircraft equipage issues restricting departure routes during inclement weather events, aircraft spacing requirements reducing airport capacity, and airline scheduling plans that could lead to extreme congestion at major airports. A familiar scene at airports these days is when arriving flights are forced to wait on the ramp, sometimes for a long time, before finally proceeding to their gate because the gate is occupied by another aircraft.

## 1.1   Gate Availability

Gate space is often a limiting factor in determining an airport's physical capacity. When arrivals significantly outnumber the number of pushbacks from the gate for an extended period, an accumulation of aircraft occurs. If the airport does not have enough gates to accommodate the arrivals, gate congestion begins and the arriving passengers will have to wait for an available gate. This excess accumulation of aircraft causes a high departure demand later in the day when the number of pushbacks from the gate exceeds the departure capacity of the airport. This condition leads to excessive surface delays.

The critical metric that must be captured is to represent gate availability as a function of the number of arrivals minus the number of pushbacks plus the number of occupied gates. At the beginning of the day, gates are initially occupied by flights that remain overnight (RON). This reduces the number of available gates to the total airport gates minus the RON flights. RON flights are determined from the following criteria:

1. Arrival/Departure sequence where an aircraft departure time is earlier than the arrival time at an airport for a day
2. Departure only with no arrival for a particular aircraft at the airport for the day

1



3. When the number of arrivals exceed the number of departures by one for multiple flights at an airport for the same aircraft on a day
4. Arrival only with no departure for the aircraft at the airport for that day

Aircraft are tracked using their tail numbers or registration identification and not their call sign or flight number as these are subject to change. Explicit consideration of gate availability should help mitigate long taxi-in delays as well.

The gate assignment and allocation issue is a complex one. It involves air carrier rights to particular gates as detailed in a contract or lease agreement with the airport, airport policies and procedures, and the type of gates offered. The types of gate leases offered by airports to airlines and airlines to airlines consist of:

1. Exclusive Rights
2. Preferential Rights
3. Shared or Sublease Rights
4. Common Use Rights

Preferential, shared, and common use contracts are governed by airport policies specified in lease agreements and may set priorities based on gate utilization history by various airlines and whether the flight is domestic or foreign. Usually, international flights have top priority.

All airports are required to submit a Competition Plan with periodic updates to the Federal Aviation Agency (FAA) in compliance with Section 155 of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21, Public Law 106-181). As a requirement to satisfying this Act, airports have considered providing more common use access to gates, shorter terms and "use or lose" clauses in lease agreements with airlines having exclusive rights to gates, and providing gate utilization reports. The issue is that underutilized gates may contribute to airport congestion when gates are not available to accommodate all arrivals.

With exclusive rights lease agreements among airports and airlines, the issue of gate availability becomes more complicated. It is possible that congestion can be initiated even though demand for a gate does not exceed the number of gates available at an airport. This is because the wrong type of gate is available: wide body vs. narrow body or a Delta vs. a JetBlue gate. Understanding the specifics of the demand is paramount to alleviating the issue. Hence, a determination of the type of demand and the attributes of a gate is important in determining the nature of excessive surface delays.

Gate attributes are important in understanding the gate availability issue. Since a gate may not be able to handle certain aircraft. In researching XSDs, it has been determined that the following gate types are important in addition to the gate ownership:

1. Turboprop
2. Regional Jet
3. Narrow Body Domestic

2



4. Narrow Body International
5. 757
6. Wide Body Domestic
7. Wide Body International
8. Jumbo Jet
9. Military
10. Helicopter

## 1.2 Air Carriers Experiencing Frequent Excessive Surface Delays

As shown in **Figure 1**, from January thru December of 2008, there were 7,150 flights with a Taxi-Out time greater than two (2) hours with the bulk of these flights (5,918) occurring within the two (2) to three (3) hour range. Although these flights only represented 0.1% of the total number of flights (6,938,216) during the year, this is still a significant number of flights from a consumer perspective.



Figure 1: Number of Flights with Taxi-Out Times > 120 Minutes (January – December 2008)

As shown in **Table 1**, American Airlines led all carriers with 12.7% of all incidences with Taxi-Out times greater than 120 minutes. Delta was a close second with 10.3% of the total number of incidences with Taxi-Out times greater than 120 minutes. American Airlines lead in both the 121-179 minutes and 180-239 minutes categories, while Delta and JetBlue lead all carriers in the 240-299 minutes and Continental leads all carriers in the > 300 minutes categories.

These percentages are somewhat misleading. American and American Eagle are really associated airlines being owned by the AMR Corporation; Delta, Northwest (wholly owned subsidiary of Delta Airlines), Atlantic Southeast (Delta Connection), and Comair (wholly owned subsidiary of Delta Airlines) are associated airlines; and Continental and ExpressJet are associated airlines based on their new 7-year Capacity Purchase Agreement.

If American and American Eagle were combined, the total number of XSDs would be 1,456 and 20.4% of the total number of XSDs. If Delta, Northwest, Atlantic Southeast, and Comair were

3



combined, the total would be 1,596 and 22.3% of the total number of XSDs. If Continental and ExpressJet were combined the total would be 1,373 and 19.2% of the total number of XSDs. Clearly, Delta, American Airlines, and Continental would be the leaders in having the most XSDs with a combined total of 61.9% of the XSDs. Delta with its Delta Connection partners and subsidiaries would be responsible for the most XSDs in 2008.

**Table 1: Taxi-Out Times (minutes) by Airline**
**(January – December 2008)**

| Number | Carrier Name | Code | 120-179 | 180-239 | 240-299 | 300+ | Total | % |
|--------|--------------|------|---------|---------|---------|------|-------|-----|
| 1 | American | AA | 738 | 149 | 20 | 2 | 909 | 12.7 |
| 2 | Delta | DL | 565 | 115 | 44 | 14 | 738 | 10.3 |
| 3 | ExpressJet | XE | 598 | 106 | 12 | 10 | 726 | 10.2 |
| 4 | Continental | CO | 513 | 106 | 13 | 15 | 647 | 9.0 |
| 5 | United | UA | 500 | 69 | 9 | 2 | 580 | 8.1 |
| 6 | American Eagle | MQ | 497 | 44 | 1 | 5 | 547 | 7.7 |
| 7 | US Airways | US | 439 | 77 | 27 | 2 | 545 | 7.6 |
| 8 | JetBlue | B6 | 382 | 69 | 44 | 7 | 502 | 7.0 |
| 9 | Comair | OH | 318 | 54 | 18 | 7 | 397 | 5.6 |
| 10 | SkyWest | OO | 269 | 31 | 3 | 0 | 303 | 4.2 |
| 11 | Northwest | NW | 221 | 27 | 4 | 0 | 252 | 3.5 |
| 12 | AirTran | FL | 211 | 35 | 2 | 0 | 248 | 3.5 |
| 13 | Atlantic Southeast | EV | 173 | 24 | 11 | 1 | 209 | 2.9 |
| 14 | Southwest | WN | 190 | 14 | 1 | 1 | 206 | 2.9 |
| 15 | Mesa | YV | 143 | 14 | 0 | 0 | 157 | 2.2 |
| 16 | Pinnacle | 9E | 118 | 12 | 3 | 1 | 134 | 1.9 |
| 17 | Frontier | F9 | 30 | 3 | 1 | 0 | 34 | 0.5 |
| 18 | Alaska | AS | 13 | 3 | 0 | 0 | 16 | 0.2 |
| | Total | | 5,918 | 952 | 213 | 67 | 7,150 | |

By combining affiliated airlines totals, the percent of XSDs per flight operations for the affiliated airlines are shown in **Table 2**.

4

Table 2: Taxi-Out Times (minutes) by Affiliated Carriers by Time Category by % of Flight Operations
(January – December 2008)

| Carrier Name | Code | Total Flights | 120-179 | A: 180-239 | B: 240-299 | C: 300+ |
|---|---|---|---|---|---|---|
| American/American Eagle | AA/MQ | 1,054,400 | 0.12% | 0.02% | 0.002% | 0.001% |
| Delta, Northwest, Comair, Atlantic Southeast | DL, NW, OH, EV | 1,277,766 | 0.10% | 0.02% | 0.006% | 0.002% |
| Continental, Express Jet | CO, XE | 865,203 | 0.13% | 0.02% | 0.003% | 0.003% |

However, as shown in **Table 3**, JetBlue leads all aircraft carriers in Taxi-Out times in all categories by percent of flight operations.

Table 3: Taxi-Out Times (minutes) by all Carriers by Time Category by % of Flight Operations
(January – December 2008)

| Carrier Name | Code | Total Flights | 120-179 | A: 180-239 | B: 240-299 | C: 300+ | Rank 120-300+ | Rank 180-300+ |
|---|---|---|---|---|---|---|---|---|
| American | AA | 604,884 | 0.12201% | 0.02463% | 0.00331% | 0.00033% | 1.70 | 2.16 |
| Delta | DL | 451,931 | 0.12502% | 0.02545% | 0.00974% | 0.00310% | 1.57 | 1.60 |
| Express Jet | XE | 374,510 | 0.15968% | 0.02830% | 0.00320% | 0.00267% | 1.32 | 1.79 |
| United | UA | 298,456 | 0.17189% | 0.03552% | 0.00436% | 0.00503% | 1.18 | 1.36 |
| American Eagle | MQ | 449,516 | 0.11123% | 0.01535% | 0.00200% | 0.00044% | 1.98 | 3.44 |
| Continental | CO | 490,693 | 0.10129% | 0.00897% | 0.00020% | 0.00000% | 2.30 | 5.61 |
| US Airways | US | 453,589 | 0.09678% | 0.01698% | 0.00595% | 0.00044% | 2.13 | 2.62 |
| JetBlue | B6 | 198,092 | 0.19481% | 0.03519% | 0.02244% | 0.00357% | 1.00 | 1.00 |
| Comair | OH | 197,608 | 0.16092% | 0.02733% | 0.00911% | 0.00036% | 1.27 | 1.53 |
| Skywest | OO | 566,271 | 0.04759% | 0.00548% | 0.00053% | 0.00000% | 4.78 | 10.17 |
| Northwest | NW | 347,662 | 0.06367% | 0.00777% | 0.00115% | 0.00000% | 3.53 | 6.66 |
| AirTran | FL | 261,684 | 0.08063% | 0.01337% | 0.00076% | 0.00000% | 2.70 | 4.33 |
| Atlantic Southeast | EV | 280,675 | 0.06186% | 0.00855% | 0.00392% | 0.00036% | 3.44 | 4.77 |
| Southwest | WN | 1,201,764 | 0.01881% | 0.00116% | 0.00008% | 0.00008% | 14.93 | 45.96 |
| Mesa | YV | 264,930 | 0.05609% | 0.00549% | 0.00000% | 0.00000% | 4.16 | 11.14 |
| Pinnacle | 9E | 262,208 | 0.04500% | 0.00458% | 0.00114% | 0.00088% | 5.01 | 10.03 |
| Frontier | F9 | 95,762 | 0.03133% | 0.00313% | 0.00104% | 0.00000% | 7.21 | 14.65 |
| Alaska | AS | 151,102 | 0.00860% | 0.00199% | 0.00000% | 0.00000% | 24.18 | 30.82 |
| **Total** | | 6,938,216 | 0.08630% | 0.01372% | 0.00307% | 0.00097% | | |

The magnitude of the issue is exacerbated when JetBlue is used as the standard to compare Taxi-Out times with all air carriers. Consider dividing JetBlue's percentage of Taxi-Out times by each air carrier's Taxi-Out times. As listed in **Error! Reference source not found.**, JetBlue has no equal in experiencing the greatest number of flight Taxi-Out times greater than 120 minutes per flight operation. According to **Table 3**, JetBlue is 14.93 times more likely to experience a Taxi-Out delay in the two (2) to three (3) hour range than Southwest and 45.96 times more likely to experience a Taxi-Out delay > three (3) hours than Southwest.

Obviously, any analysis of the Taxi-Out delay problem must focus on what is happening with JetBlue. Understanding the JetBlue issue is critical to understanding excessive surface delays. In addition, the nearest airlines to JetBlue in terms of excessive air delays such as Comair, US Airways, Continental, American, and Delta must also be analyzed.

5

*METRON AVIATION*

## 1.3 Airports where Excessive Surface Delays Occur Most Frequently

BTS only provides airport data for Taxi-Out times greater than three (3) hours for airports. There have been 1,232 reported incidences from January to December of 2008. However, when examining airports, it appears that only certain airports share the bulk of the problems. **Table 4** lists the airports where 92.149% of the incidences have occurred. They were selected as being ranked in the top 100 in terms of severity of Excessive Surface Delays using JFK as the standard of measure. As shown in **Table 4**, JFK has the greatest number of incidences (293) where passengers waited in a Taxiway for more than 180 minutes or three (3) hours. JFK also had the greatest number of incidences (22) where passengers had to wait for more than 300 minutes or 5 hours. The % of Max is obtained by dividing the Total for an Airport by 1,232 incidences.

**Table 4: Number of Flights by Airport with Taxi-Out Times (minutes) > 3 Hours**
**(January – December 2008)**

| Airport Rank | Origin Airport | Code | Total |
|---|---|---|---|
| 1 | New York JFK | JFK | 293 |
| 2 | Newark | EWR | 130 |
| 3 | Atlanta | ATL | 107 |
| 4 | Philadelphia | PHL | 105 |
| 5 | New York LaGuardia | LGA | 90 |
| 6 | Houston Bush | IAH | 77 |
| 7 | Dallas/Ft. Worth | DFW | 70 |
| 8 | Chicago O'Hare | ORD | 43 |
| 9 | Washington Reagan | DCA | 30 |
| 10 | Washington Dulles | IAD | 26 |
| 11 | Salt Lake City | SLC | 17 |
| 12 | Boston | BOS | 16 |
| 13 | Charlotte | CLT | 14 |
| 14 | Phoenix | PHX | 11 |
| 15 | Detroit | DTW | 7 |
| 16 | Columbus, OH | CMH | 6 |
| 17 | Memphis | MEM | 6 |
| 18 | Raleigh/Durham | RDU | 5 |
| 19 | St. Louis | STL | 5 |
| 20 | Cleveland | CLE | 5 |
| 21 | Kansas City | MCI | 5 |
| 22 | Miami | MIA | 5 |
| 23 | Baltimore | BWI | 4 |
| 24 | Indianapolis | IND | 4 |
| 25 | Milwaukee | MKE | 4 |
| 26 | Pittsburgh | PIT | 4 |
| 27 | Buffalo | BUF | 2 |
| 28-132 | Other | | 108 |
| | Total | | 1,199 |

It is clear that there may be a link between the airports and the air carriers where most of the incidences are occurring. Is there a connection that needs to be understood among JetBlue, Comair, Continental, US Airways, Delta, and American, at JFK, EWR, LGA, IAH, ATL, PHL, and DFW?

6

By examining what airports air carriers experience excessive surface delays may provide some critical information about the nature of excessive surface delays.

## 1.4 Taxi-Out Times Relating Airports to Air Carriers

**Table 5** shows the airports where each air carrier experience XSDs > 3 hours. American Airlines (AA) experiences 33.9% of their XSDs at DFW and 16.4% at JFK. Delta Airlines (DL) experiences 44.85% of their XSDs at JFK and 30.3% at ATL. Continental (CO) experience 48.5% of its XSDs at EWR and 32.3% at IAH. Comair (OO) experiences 64.6% of its XSDs at JFK. Express Jet (XE) experiences 37.8% of its XSDs at EWR and 22% at IAH. United Airlines (UA) appears to experience a near even amount of XSDs at various airports: 18.4% at JFK, 17.1% at IAD, 13.2% at PHL, 13.2% at LGA, and 11.8% at ORD. US Airways (US) experiences 56.2% of its XSDs at PHL. JetBlue (B6) experiences 86.4% of its XSDs at JFK. AirTran (FL) experiences 41.7% of its XSDs at ATL and 25% of its XSDs at LGA. Atlantic Southeast (EV) experiences 72.2% of its XSDs at ATL.

**Table 5:** Incidence Map Relating the Number of Taxi-Out Incidences > 3 Hours by Airport and Airline (January – December 2008)

| Airport Rank | Origin Airport | Code | AA | DL | CO | XE | B6 | US | OH | UA | MQ | FL | EV | OO | NW | WN | 9E | YV | F9 | AS | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New York JFK | JFK | 28 | 74 | 1 | 0 | 102 | 5 | 61 | 14 | 7 | 3 | 2 | 0 | 5 | 0 | 0 | 1 | 0 | 0 | 293 |
| 2 | Newark | EWR | 2 | 1 | 63 | 47 | 2 | 2 | 0 | 5 | 0 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 1 | 130 |
| 3 | Atlanta | ATL | 4 | 50 | 5 | 0 | 0 | 1 | 1 | 1 | 1 | 15 | 26 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 107 |
| 4 | Philadelphia | PHL | 8 | 6 | 2 | 0 | 0 | 59 | 2 | 10 | 0 | 4 | 0 | 1 | 3 | 7 | 2 | 0 | 1 | 0 | 105 |
| 5 | New York LaGuardia | LGA | 17 | 14 | 4 | 0 | 1 | 6 | 12 | 10 | 6 | 9 | 2 | 0 | 5 | 0 | 2 | 0 | 2 | 0 | 90 |
| 6 | Houston Bush | IAH | 2 | 0 | 42 | 28 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 77 |
| 7 | Dallas/Ft. Worth | DFW | 58 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 |
| 8 | Chicago O'Hare | ORD | 20 | 1 | 2 | 0 | 1 | 1 | 1 | 9 | 6 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 43 |
| 9 | Washington Reagan | DCA | 5 | 3 | 3 | 1 | 0 | 13 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 30 |
| 10 | Washington Dulles | IAD | 1 | 1 | 0 | 2 | 2 | 1 | 0 | 13 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 26 |
| 11 | Salt Lake City | SLC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 1 | 0 | 0 | 0 | 0 | 17 |
| 12 | Boston | BOS | 2 | 3 | 1 | 0 | 3 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 16 |
| 13 | Charlotte | CLT | 1 | 1 | 1 | 4 | 0 | 4 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 14 |
| 14 | Phoenix | PHX | 0 | 1 | 0 | 0 | 0 | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 11 |
| 15 | Detroit | DTW | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 7 |
| 16 | Columbus, OH | CMH | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 17 | Memphis | MEM | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 6 |
| 18 | Raleigh/Durham | RDU | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 19 | St. Louis | STL | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 20 | Cleveland | CLE | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 21 | Kansas City | MCI | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| 22 | Miami | MIA | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 23 | Baltimore | BWI | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 4 |
| 24 | Indianapolis | IND | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 25 | Milwaukee | MKE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 26 | Pittsburgh | PIT | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 27 | Buffalo | BUF | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 28-137 | Other | | 9 | 6 | 4 | 33 | 7 | 2 | 4 | 8 | 5 | 3 | 6 | 8 | 2 | 3 | 2 | 5 | 1 | 0 | 108 |
| | Total | | 171 | 165 | 130 | 127 | 118 | 105 | 79 | 76 | 46 | 36 | 36 | 33 | 29 | 14 | 14 | 13 | 4 | 3 | 1,199 |

*Excessive Surface Delays Final Report, Task Order #: 6*

*METRON AVIATION*

It becomes exceedingly clear that most excessive surface delays occur at an airport where the air carrier has a hub or controls most of their gates. Consequently, a large number of flights are scheduled at these airports resulting in airport congestion. It is possible that too many aircraft are arriving and departing from a hub that exceeds the capacity of the airport at various times throughout the day. In addition, aircraft may be departing to a destination where they do not have many gates available and consequently must hold the flight until a gate is available based on an internal priority ranking.

**Figure 2** and **Figure 3** illustrate clearly the airports where the airlines experience the greatest number of excessive surface delays. The hub spoke network is a key factor explaining the number of excessive surface delays at the top eight (8) airports.

Airlines are in business to make money. It is in their best interest to schedule as many flights out of an airport as possible. Unfortunately, this drive for profits can make passengers experience less enjoyable. Fortunately, the number of excessive surface delays is small compared to the number of total flight operations. However, in the future as the travel demand increases the number of excessive surface delays may increase exponentially as the airports may reach gridlock due to the increase in demand. This makes it necessary to model airport congestion at an airport to establish trigger points when an excessive surface delay may occur. Having this information may help to mitigate excessive surface delays at capacity constrained airports like JFK, EWR and LGA.

*METRON AVIATION*



Figure 2: % Distribution of XSDs at JFK, LGA, ATL, and PHL by Airline

*Excessive Surface Delays Final Report, Task Order #: 6*



# EXHIBIT D

Commonwealth of Virginia
County of _Prince Wm_

BEFORE ME, the undersigned Notary, _Michelle A. Purdham_ _____ [name of Notary before whom affidavit is sworn]_, on this _29th_ _____ [day of month] day of _Sept_ _____ [month], 20_09_, personally appeared _Frederick J. Foreman_ _____ [name of affiant], known to me to be a credible person and of lawful age, who being by me first duly sworn, on _his_ _____ [his or her] oath, deposes and says:

On Friday, September 25, 2009 at approximately 10:00 AM, I was escorted by two (2) Metron Aviation, Inc. employees into the office of Mr. James Gaughan, Senior Vice-President and General Manager. Mr. Gaughan asked me to go over the chronology of my interaction with the media. I told him my interaction with the media as I remembered it. He told me that what I told him was not consistent with information that he had. I responded by asking him what are you talking about? He immediately said that I had contact with Ms. Kate Hanni on Thursday, September 24, 2009. I said yes I did but Kate Hanni is not the media so that my statements about the chronology of events are correct. Mr. Gaughan proceeded to show me on his computer monitor what appeared to be hacked and stolen email communications within the last six (6) months or more between Kate Hanni and me, me and Gary Stoller of USA Today, me and Susan Stellin, a freelance reporter, and Kate Hanni and a number of people concerning the Passenger Bill of Rights, excessive surface delays, and other private communications. It was clear that they had email transactions from both of my private email accounts: Hotmail (eckmaster12@msn.com) and Yahoo (eckmaster@mmi-gov.com). It was also clear that these emails were from Kate Hanni's private and personal email account (katcrew4@aol.com), as well as from Gary Stoller's (gstoller@usatoday.com) private USA Today account, and Susan Stellin's (stellin@earthlink.net) private and personal email account. There were no emails communications from Metron Aviation's email system only communications from private accounts. James Gaughan told me that Delta Airlines were afraid that Kate Hanni was going to use the information that I gave her as fuel for getting the Passenger Bill of Rights passed in Congress. He said that Delta Airlines sent this information to them. I took this to mean that Delta Airlines and Metron Aviation both had a copy of these hacked and stolen email communications. Mr. Gaughan said that Delta was mad and upset that one of Metron Aviation's employees had provided Kate Hanni with this kind of information. He said that I had put Metron Aviation in a precarious situation with Delta Airlines and that at a minimum I had not been a good employee by doing this. I tried to explain to him that what I sent to Kate Hanni on 9-25-2009 could be obtained by anyone by simply analyzing the public information that is available online and provided by the Department of Transportation, Bureau of Transportation and Statistics, but to no avail. Based on these hacked and stolen email communications, James Gaughan of Metron Aviation, Inc. decided to terminate my employment. The two (2) Metron Aviation escorts took me to my desk where I got my personal belongings and then they escorted me out of the building at approximately 12:15 PM.

_Frederick J. Foreman_
Frederick J Foreman
14525 Chamberry Cir
Haymarket, VA 20169

Subscribed and sworn to before me, this _29th_ , [day of month] day of _Sept_ [month], 20_09_

[Notary Seal:]

_Michelle A Purdham_
[Signature of Notary]
_Michelle A Purdham_
[Typed name of Notary]

NOTARY PUBLIC

My commission expires: _11·30_ , 20_11_

OFFICIAL SEAL
NOTARY PUBLIC-COMMONWEALTH OF VIRGINIA
MICHELLE A. PURDHAM
COUNTY OF PRINCE WILLIAM
ID# 160821
My Commission Expires
November 30, 2011

PLAINTIFF'S
EXHIBIT
D